**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

MICHELLE SIEBRECHT,

        Plaintiff,

vs.

MERCY HEALTH SERVICE – IOWA
CORP., d/b/a MercyOne Siouxland
Medical Center,

        Defendant.

No.  23-CV-4014-KEM

**MEMORANDUM OPINION
AND ORDER**

_____

Plaintiff Michelle Siebrecht brings discrimination claims under the Americans with Disabilities Act[1] (ADA) and Iowa Civil Rights Act[2] (ICRA), and under the Federal Medical Leave Act[3] (FMLA).  The parties have filed various motions[4]:

- **Siebrecht filed a motion for partial summary judgment** (Doc. 43) and related documents (Doc. 46) for a ruling that she is disabled under the law (for her ADA and ICRA claims).  Mercy filed a resistance (Doc. 57) and related documents (Docs. 58-62), and Siebrecht filed a reply (Doc. 74).

- **Mercy filed a motion for summary judgment (Doc. 50)** and related documents (Doc. 47), arguing that Siebrecht cannot establish any of her claims.  Siebrecht filed a resistance (Docs. 70) and related documents (Docs. 72-73).  Mercy filed a reply (Doc. 86) and related documents (Docs. 87, 92).  Siebrecht filed a sur-reply (Doc. 98).

---

[1] **42 U.S.C. §§ 12101-12213**.

[2] **Iowa Code chapter 216**.

[3] **29 U.S.C. §§ 2601-2654**.

[4] Siebrecht also moved to strike one of Mercy's replies (to its sanctions motion) (Doc. 82), which I previously denied (Doc. 90).  The unresolved motions are listed in bold.

- **Mercy moves for sanctions against Siebrecht (Doc. 37)** for withholding medical records. Siebrecht filed a resistance (Doc. 55) and related documents (Doc. 56). Mercy filed a reply (Doc. 78) and related documents (Doc. 76). Siebrecht filed a sur-reply (Doc. 91). **Mercy also moves to supplement its motion (Doc. 95)**, which Siebrecht did not resist.

- Relatedly, **Siebrecht seeks to supplement the record** on her partial summary judgment motion (**Doc. 94**), which Mercy resists (Doc. 100), and her resistance to Mercy's summary judgment motion (**Doc. 79**), which Mercy also resists (Doc. 84), to which Siebrecht filed a reply (Doc. 93).

The court denies as moot Siebrecht's motions to supplement, denies Siebrecht's motion for partial summary judgment, grants Mercy's motion for summary judgment on all claims, and denies as moot Mercy's motions for sanctions and to supplement.

# I. BACKGROUND[5]

Siebrecht worked as a licensed physician assistant (PA) for Mercy in the emergency room (ER) at its facility in Hawarden, Iowa. The Hawarden facility is a Critical Access Hospital, meaning its ER must be staffed twenty-four hours per day, seven days a week, 365 days per year. Hawarden has a population of approximately 2,700 people, making it difficult to readily find ER providers.

During the relevant period[6] from 2021 to 2022, Mercy staffed this ER with four providers: Siebrecht, PA Heather Kreber, nurse practitioner (NP) Alexis Semmler, and NP Molly Post, collectively known as advanced practice providers (APPs). Mercy had written "Non-Physician Employment Agreements" with the four APPs. Each contract had an initial term; Siebrecht's contract was for an initial term of two years (from March

---

[5] Facts without a citation in this order are taken from the parties' Statements of Facts admitted by the opposing party (Docs. 57-1, 70-1, 72-2, 74-1, 86-1, 87-1) and the undisputed documents in the record.

[6] In total, Siebrecht was employed by Mercy from January 16, 2019, until May 30, 2022.

1, 2020, to February 28, 2022), and the other three APPs had initial terms of three years. Each contract provided that at the end of the initial term, the contract could be extended by written agreement, and that it could continue temporarily on a month-to-month basis for up to 90 days (referred to as the Temporary Renewal Period). If the parties did not agree to extend the contract, it terminated after either 30-days written notice or else at the end of the Temporary Renewal Period. Siebrecht's Temporary Renewal Period ended May 29, 2022.

Siebrecht's contract required that she work three 24-hours shifts (a total of 72 hours) every two weeks, and that for every four-week period, she must work two of those shifts on weekends. Siebrecht and the other APPs did not have assigned shifts. April McCord (ER supervisor and trauma coordinator who scheduled ER providers) circulated the next month's schedule to the APPs and they indicated their preferred shifts. Mercy filled any uncovered shifts with PRNs (providers not obligated to work a specific number of hours who chose the days they worked) and locums (credentialed providers hired to work when needed). Mercy always struggled both to fill shifts and to fairly schedule weekend shifts between the APPs.

Siebrecht received a diagnosis of multiple sclerosis (MS) in 2014. Siebrecht took a period of FMLA leave beginning June 3, 2021. Siebrecht's primary care physician, Curtis R. Hesse, DO, completed the documentation for this leave (signed June 21, 2021). Dr. Hesse indicated Siebrecht required leave for "4-6 weeks or longer" due to an "acute exacerbation" of "chronic MS." Def. App. 174.[7] Dr. Hesse indicated this began in mid-

---

[7] The following abbreviations cite to the listed records in this case:

| Abbreviation | Documents Referenced | Docket Number |
|---|---|---|
| "Def. App." | Mercy's Appendix to its Motion for Summary Judgment (Mercy's Motion) | Docs. 47, 50-3, 50-4 |
| "Pl. Res. App." | Siebrecht's Appendix in resistance to Mercy's Motion | Docs. 70-3, 72-4 |

May of 2021, and estimated Siebrecht would need leave from June 3, 2021 (the day he examined her), through August 1, 2021. Under relevant facts, he wrote that Siebrecht's MS was exacerbated "due to ongoing stress at work and at home" and that she had "difficultly concentrating and thinking clearly," and that she also had muscle spasms in her lower extremities with numbness that caused falls. *Id.* at 174. Dr. Hesse checked yes to the question, "Will the condition cause episodic flares periodically preventing the employee from performing his/her job functions?"—he also wrote that it would be necessary for Siebrecht to be absent during flare-ups. *Id.* at 175. He explained her absence "would be necessary if she is unable to critically cognitively think." *Id.* Dr. Hesse estimated that Siebrecht's flares would occur once every four months and last 5-7 days per episode. *Id.* Siebrecht ended up taking just over eight weeks of leave (through August 1). She returned to work on August 2, 2021, when Dr. Hesse released her to return to work without any restrictions.

Sometime in January 2022, Siebrecht experienced some vision loss in one eye after working a 48-hour shift. Siebrecht did not work another 48-hour shift again. Siebrecht asserts she was under significant stress during that time period due to her divorce and other family issues. On January 25, 2022, Jayson Pullman (the chief executive officer at the Hawarden facility) gave Siebrecht a proposed extension to her contract, to extend it from January 24, 2022, to February 28, 2023. In response, Siebrecht laughed and said, "absolutely not." The parties dispute whether she explained that she believed they needed

| "Pl. App." | Siebrecht's Appendix to her Motion for Partial Summary Judgment (Siebrecht's Motion) | Docs. 43-3, 46 |
| "Def. Res. App." | Mercy's Appendix in resistance to Siebrecht's Motion | Docs. 58, 59-1, 60-62 |

The parties have submitted duplicative documents in their appendices; citations to the record in this order do not cross-reference duplicate documents.

to negotiate terms, such as pay (Mercy claims she said nothing more, and Siebrecht claims she told Pullman, "I'm not going to sign it with that rate" or something similar). Pl. Res. App. 24. After that exchange, Siebrecht never made a counteroffer or brought up the issue of negotiating the contract, nor did Mercy raise the issue with Siebrecht. Siebrecht texted the other APPs that Pullman had tried "tricking me into signing my renewal of my contract" when she met with him. Def. App. 181. She added emojis (one surprised and four laughing) and wrote, "Yeah, no. I don't think so." *Id*. During this text discussion, Siebrecht said she told Pullman a lot of negotiating needed to be done but that she didn't give him a chance to respond. Def. App. 182-83. Under her contract, Siebrecht's initial term ended February 28, 2022, and she could only continue her employment 90 days without signing another contract.

Siebrecht took a second period of FMLA leave beginning on January 31, 2022. Dr. Hesse again completed the FMLA paperwork (dated February 3, 2022) and indicated the leave was due to Siebrecht's "chronic MS" with "acute exacerbation" that started on January 29, 2022. Def. App. 178. Under relevant facts on that form, Dr. Hesse indicated Siebrecht's MS had been "exacerbated again due to excessive work schedule and continued stress at home" and caused "cognitive issues" and "intermittent loss of vision along with lower extremity numbness [and] weakness." *Id*. Dr. Hesse estimated Siebrecht would need "4-6 weeks" of leave, from January 29, 2022, to March 9, 2022. Def. App. 178-79. He again answered that her condition would cause periodic flare-ups every 6-8 months and last 20-30 days per flare. *Id*. at 179. He explained "her job requires clear, critical cognition which she may not have fully when her MS is flaring." *Id*.

On February 1, 2022, the day after Siebrecht began her FMLA leave, Pullman emailed McCord: "I was just notified by Michelle Siebrecht that she will be placed on short term disability for a month due to MS flare up." The same day, Pullman forwarded

that email to Danielle Pingel[8] (Mercy's Executive Director of Rural Hospital and Clinic Operations) and Amy Brock (Mercy's contract and compliance specialist), adding, "Please see below, just giving you a heads up and she refused to sign the extension of her contract?"

During a visit on February 25, 2022, Dr. Hesse noted that Siebrecht "probably [could] return back to work by middle of March" but noted the minimum 24-hour shift "really seem[ed] to be an extremely long time for someone with her condition." Def. App. 294. Dr. Hesse's treatment notes indicate he would allow her to return to work as follows:

> [N]o more than 1 24 hour shift[] and no more than once per week, Monday through Friday, as weekends in the ER tend to be much more hectic, so I am going to limit her right now to those days and then if she continues to do well with that, then we can add in more days, but the condition [(MS)] obviously is going to have flare ups throughout the rest of her life, so there is really no ending to this.

Def. App. 294. Dr. Hesse noted that Siebrecht's MS "seem[ed] to be getting a bit worse." Def. App. 292. He planned to see Siebrecht back for a checkup in three months' time (late May 2022). Def. App. 294. On March 1, 2022, Dr. Hesse released Siebrecht to return to work on March 14, 2022, with the following restriction: "No more than 24 hours per week; Monday thru Friday – no weekends until further notices. [Followup] with me on 5-26-22." Def. App. 318. Dr. Hesse also completed a form dated and faxed to Mercy the same date as the release. Def. App. 296. In it, Dr. Hesse stated Siebrecht's restrictions were expected to last through December 31, 2022. *Id.* Below that, next to a question of whether the workday would be continuous or intermittent, Dr. Hesse handwrote, "Workday is a 24 hour shift." *Id.* Dr. Hesse testified during his deposition that Siebrecht would have MS flares for the rest of her life, that they would be an ongoing issue. Pl. App. 102. He further explained that he believed that Siebrecht should not work 24-hour shifts and that 8- or 12-hour shifts would be

---

[8] Pingel's last name has since changed to Lentsch.

better.  Pl. App. 100.  In imposing the restricted work schedule, Dr. Hesse specifically wrote "no more than 24 hours per week . . . versus 24-hour shift" because he believed it would be better for Siebrecht to work multiple 8-hour shifts, for example, rather than 24-hour shifts.  Pl. App. 100, 102.  A few days after Dr. Hesse released Siebrecht to return to work with the restricted schedule, Siebrecht told McCord that Siebrecht could work only 24 hours (total) per week on Mondays through Fridays (no weekends).  Def. App at 101-02, 270.  Siebrecht explained that her doctor did not want her working weekends because they were the busiest times in the ER.  Def. App. 105, 274.  She also told McCord that her doctor thought her working 12-hour shifts would be okay, but that he did not think she should be working 24-hour shifts at all.  *Id.* at 105-06; 270, 274. Siebrecht told McCord that her work restrictions would be in place until further notice.[9] *Id*. 101-02, 270.

On March 16, 2022, Erin Boomsma (human resources specialist with Mercy) sent an email that stated Mercy could accommodate the restricted schedule, but she could not confirm the accommodation could be made through December 31, 2022.  Pl. Res. App. 101-02.  On March 28, 2022, Pullman emailed Pingel, stating: "[Siebrecht] is now saying that her doctor states that she will be doing 1 (24) hr shift through December.  This is not working out the best and I think we may need to terminate her and let her disability run out."[10]  Pl. Res. App. 339.  Pullman explained during his deposition that he was expressing concern about Siebrecht only working 24-hour shifts through December, that she wasn't able to meet her required shifts, and that it was unfair and caused a burden on

---

[9] In a later text, she again said the restrictions were until further notice and that her follow up wasn't until the end of June.  Def. App. 274.

[10] On March 30, 2022, Pingel forwarded this email to Walberg and Mercy's chief human resources officer (copying Pullman), saying, "We have been notified that [Siebrecht] will be doing 1-24 hour shift through December.  This will not be feasible for us to continue to operate the ER with only receiving 1 shift from [Siebrecht] per pay period.  Last we spoke, you mentioned we could legally provide her notice.  Thoughts on the best approach to handling this? We would like to provide her with a 90-day notice per her contract."  Pl. Res. App. 338.

others in the department. Pl. Res. App. 186, 186B. At least one of Siebrecht's colleagues had complained to Pullman that Siebrecht's medical leave was unfair and raised concerns about Siebrecht's activities while on FMLA leave (implying these activities were inconsistent with her purported need for leave). Pullman responded that he understood the concerns but that his hands were tied, and they had to let the process play out. Pullman relayed the colleague's concerns to Pingel. At some point Pullman and Pingel had a conversation during which Pingel asked if Pullman thought Siebrecht should be terminated. Pl. Res. App. 186B. Pullman said yes, that Siebrecht was unreliable, that they could not meet the restricted schedule, and that it was unfair and caused a burden to other providers. *Id.*

Sometime after Pullman offered and Siebrecht rejected the contract extension on January 25, Mercy worked on amended contracts for Siebrecht and the other APPs (including changes in pay rates). In late March 2022, Semmler inquired about her renewal offer prior to her contract expiring in early April, and in emails dated March 30, 2022, Brock told Pullman and Pingel that the contract revisions were still ongoing. Pl. Res. App. 104-06. On April 14, 2022, Brock emailed Pingel and Pullman that the four contract amendments (for Semmler, Kreber, Post, and Siebrecht) were approved. Pl. Res. App. 107. Brock asked Pingel and Pullman to review them for accuracy and told them that they could meet with the APPs to present the amended contracts and get them signed. *Id.* Siebrecht was never presented with the amended contract.[11]

---

[11] On May 23, 2022, Pingel emailed Pullman to ask if he was "comfortable" sharing the amended contracts with Semmler, Kreber, and Post, noting that Semmler had asked for her updated contract. Pl. Res. App. 405. Semmler signed an amended contract on May 25, 2022 (her Temporary Renewal Period ended in July 2022) and Post signed an amended contract on June 1, 2022 (her Temporary Renewal Period ended in October 2020). Pl. Res. App. 21-22. Mercy presented two separated amended contracts to Kreber prior to her employment end date of June 30, 2022. Pl. Res. App. 228. Kreber did not sign either amended contract, and Mercy terminated her employment by 30-day written notice dated July 18, 2022. *Id.* It is unclear whether the June 30 date was the end of Kreber's initial employment term or her Temporary Renewal Period.

Case 5:23-cv-04014-KEM    Document 112    Filed 09/30/24    Page 8 of 31

Mercy decided to terminate Siebrecht on April 26, 2022. Pl. Res. App. 10. The decision was made by Pingel in consultation with Beth Hughes (President of Mercy's Western Iowa Region at the time), Pullman, Julie Anfinson (Mercy's Chief Human Resources Officer), and Mercy's counsel. *Id*. Mercy notified Siebrecht of her termination by a written letter dated April 28, 2022. The letter stated that because the parties had not renewed or entered into a new agreement, Siebrecht's employment with Mercy was terminated effective May 30, 2022 (the day after her Temporary Renewal Period ended). It was not typical for Mercy to terminate contracts when the employee had not signed an extension prior to the end of the Temporary Renewal Period. Pl. Res. App. 160. On May 20, 2022, Mercy notified Siebrecht by letter that she was relieved of further shifts and would continue to receive regular pay through her termination date (May 30). Siebrecht never had any disciplinary actions during her employment with Mercy.

At a three-month checkup on May 26, 2022, Dr. Hesse noted that Siebrecht's MS appeared to be stable. He signed a "Release to Return to Work" statement (dated June 21, 2022) that released Siebrecht to return to work with no restrictions effective June 13, 2022. Pl. App. 52-53. The release noted that fatigue would be Siebrecht's biggest issue with working full time, and would just depend on any flare-up of MS. Pl. App. 52.

## *II. DISCUSSION*

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court

9

"view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."[12]

## A. Discrimination Claims

The ADA and the ICRA prohibit an employer from discriminating against a "qualified individual" based on their disability.[13] To establish a discrimination claim, a plaintiff must show (1) she is disabled, (2) she was a qualified individual, and (3) she suffered an adverse employment action based on her disability.[14] Discrimination can include intentional discrimination proven by evidence of disparate treatment or a failure to reasonably accommodate a disability.[15] Proof of discrimination depends on the type of discrimination alleged. "Depending on which kind of discrimination is at issue, different burden-shifting analyses are applied. The allocation of the burdens of production and persuasion between the plaintiff and the defendant, in turn, affects the analysis of a summary judgment motion made by the defendant."[16]

---

[12] *Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)); *accord* *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010).

[13] *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 940 (8th Cir. 2018); *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003) (noting Iowa Code § 216.6(1) (ICRA) "pronounces a general proscription against discrimination" but that the courts "have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply [Iowa] statute[s]").

[14] *Rehrs v. Iams, Co.*, 486 F.3d 353, 356 (8th Cir. 2007); *Faidley*, 889 F.3d at 940 ("ADA and ICRA disability discrimination claims are analyzed in the same fashion."); *Casey's Gen. Stores*, 661 N.W.2d at 519 (noting ICRA has same elements as ADA claim).

[15] *Lipp v. Cargill Meat Sols. Co.*, 911 F.3d 537, 543 (8th Cir. 2018); *Peebles v. Potter*, 356 F.3d 761, 765 (8th Cir. 2004).

[16] *Peebles*, 354 F.3d at 765-66 & n.4 (involving claims under the Rehabilitation Act, but recognizing that the same elements apply for ADA claims, except that under the Rehabilitation Act, the disability must be the sole motivation for discrimination); *Lipp*, 911 F.3d at 543 (noting the Eighth Circuit "has 'long recognized' that a party may prove intentional discrimination under

In intentional discrimination claims, discrimination occurs when the disabled individual is treated differently because of their disability, making discriminatory intent a key element.[17] This can be proven through either direct or indirect evidence.[18] Direct evidence means "evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action."[19] "Employer actions or remarks that reflect a discriminatory attitude, comments that demonstrate a discriminatory animus in the decisional process, or comments made by individuals closely involved in employment decisions may all constitute direct evidence of discrimination."[20]

Alternatively, a plaintiff can prove discrimination through indirect evidence under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*,[21] which requires proof that the plaintiff was discharged under circumstances from which unlawful discrimination could be inferred.[22] If the plaintiff makes this showing (in addition to proving she was disabled and a qualified individual), the burden shifts to the employer to

---

the ADA either by direct or indirect evidence" (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004))); *see also Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003) ("The burden of proof depends on the type of claim that is alleged.").

[17] *Peebles*, 354 F.3d at 766.

[18] *Lipp*, 911 F.3d at 543.

[19] *Griffith*, 387 F.3d at 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)) (noting "direct evidence" in this context "is not the converse of circumstantial evidence," but rather "refers to the causal strength of the proof").

[20] *EEOC v. Crain Auto. Holdings, LLC*, 372 F. Supp. 3d 751, 756 (E.D. Ark. 2019).

[21] 411 U.S. 792 (1973).

[22] *Lipp*, 911 F.3d at 544; *Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 908 (8th Cir. 1999).

provide a legitimate, nondiscriminatory reason for terminating the plaintiff.[23]  If the employer does so, the burden shifts back to the plaintiff to show that the employer's nondiscriminatory reason was a pretext and that the employer actually discharged the plaintiff due to discrimination.[24]  Whether a plaintiff relies on direct or indirect evidence of discrimination, she must also prove she was disabled under the law and that she was qualified to perform the essential functions of her position, with or without reasonable accommodation.[25]

Reasonable accommodation claims, on the other hand, do not depend on the employer's intent or motive; "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations."[26]  Accordingly, a modified burden-shifting analysis applies.[27] The plaintiff must make a prima facie showing of the elements—that she (1) was disabled under the law, (2) suffered an adverse employment action, and (3) was a qualified individual.[28]  The burden shifting applies to the "qualified individual" element, which requires the plaintiff to show that she has the qualifications to perform the job, and that

---

[23] **Rehrs**, 486 F.3d at 356; **Stanback**, 180 F.3d at 908.

[24] Id.

[25] See, e.g., **Duello v. Buchanan Cnty. Bd. of Supervisors**, 628 F.3d 968, 971-74 (8th Cir. 2010) (affirming grant of summary judgment to employer that explicitly fired plaintiff because of his disability, since plaintiff could not prove he was qualified).

[26] **Peebles**, 354 F.3d at 766-67 ("The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.").

[27] **Fenney**, 327 F.3d at 712 (collecting cases); see also **Peebles**, 354 F.3d at 767 (holding McDonnell Douglas does not apply to reasonable accommodation claims).

[28] **Fenney**, 327 F.3d at 712.

she can perform the essential functions of the job, with or without accommodation.[29]

> Although the plaintiff retains the ultimate burden of proving that he is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to "put on some evidence of those essential functions." This only makes sense because "much of the information which determines those essential functions lies uniquely with the employer."

> Further, if the employee cannot perform the essential functions of the job without an accommodation, he must only make a "facial showing that a reasonable accommodation is *possible*. . . ." "The burden of production [then] shifts to the employer to show that it is unable to accommodate the employee." "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of his individual capabilities." "At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination."[30]

The plaintiff always retains the burden of persuasion, including to prove she is a qualified individual.[31]

Siebrecht alleges that Mercy failed to accommodate her disability (including by failing to engage in the interactive process to find a reasonable accommodation) and that Mercy wrongfully terminated her employment based on her disability. I address both claims in the context of the required elements, recognizing the different framework used for each type of claim.

### 1. *Disability Element*

Siebrecht seeks summary judgment on this element, arguing there is no factual

---

[29] *Id.*

[30] *Id.* (alterations in original) (quoting ***Benson v. Northwest Airlines, Inc.***, 62 F.3d 1108, 1112-13 (8th Cir. 1995); ***Fjellestad v. Pizza Hut of Am., Inc.***, 188 F.3d 944, 949 (8th Cir. 1999)).

[31] *Id.*

dispute that she is disabled under the law. Siebrecht's complaint alleges she is disabled due to MS. Doc. 3 ¶ 17. Neither party disputes that MS qualifies as a physical impairment under the ADA and ICRA. The parties disagree, however, on whether Siebrecht can prove she actually suffers from MS.

As a preliminary matter, Siebrecht seeks leave to supplement the record with additional information from her neurologist, Elizabeth Hartman, MD.[32] Docs. 79, 94. Siebrecht argues the additional information is proper as information from a treating physician; Siebrecht did not designate Dr. Hartman as an expert in this case. The additional information consists of a declaration by Dr. Hartman that Siebrecht's diagnoses include MS (along with other listed conditions), describes what led to the MS diagnosis, contains information about Siebrecht's treatment up to 2015, summarizes the results of magnetic resonance imaging (MRI) from November 2019, and lists dates during which Siebrecht was treated by Dr. Hartman (up to October 26, 2021; she did not see Dr. Hartman again until June 21, 2024). Docs. 79-1, 94-1. Siebrecht's counsel obtained this additional information during the course of summary judgment briefing. Mercy objects to allowing this supplementation, arguing the additional information contains improper expert opinions and that Mercy would be prejudiced by allowing new information gathered at this point in the case. The court is inclined to not allow the supplementation because it provides information beyond what was already in the record and was prepared specifically to rebut arguments raised in summary judgment. Even if the court considers the additional information, however, a material dispute of fact still exists about whether Siebrecht has MS (and if so, whether MS or other conditions made her disabled or necessitated accommodation). Accordingly, I will consider Siebrecht's additional evidence, without addressing whether the motion to supplement is properly granted.

---

[32] Dr. Hartman's main focus is MS and headaches, including migraines. Pl. App. 109.

14

Siebrecht carries the burden of establishing that she was disabled.[33]  A plaintiff can establish disability by showing: (1) an impairment that substantially limits a major life activity, (2) a record of impairment, or (3) being regarded as having an impairment.[34]  Siebrecht relies on the first two—she actually has MS and she has a record of MS. Siebrecht's medical records list MS as one of her conditions, and the leave and work-restriction paperwork Dr. Hesse submitted to Mercy are based on Siebrecht having MS. A plaintiff "cannot merely rely on her diagnosis" or a history (record) of claimed physical impairments; the plaintiff "must show her MS substantially limits her in a major life activity."[35]  A fact question exists as to whether Siebrecht in fact has MS, and if so, whether it qualified as a disability under the law (whether it substantially limited a major life activity).

Dr. Hartman diagnosed Siebrecht with MS in July 2014.  Results from an MRI in June 2014 showed "[n]o abnormal enhancement to suggest active lesions," and Dr. Hartman recommended that Siebrecht go to the Mayo Clinic to "rule out MS."  Dr. Hesse's records contain a letter from Dr. Hartman dated July 16, 2014, which stated that Dr. Hartman had seen Siebrecht for follow up, listed "MS (multiple sclerosis)" under "Assessment and Plan," and under "Today's Impressions," stated that Dr. Hartman had "counselled [Siebrecht and her family] regarding diagnosis of Relapsing-remitting Multiple Sclerosis[;] [d]iscussed disease in detail, including course, typical relapse symptoms and management, prognosis, treatment, rational and expectations[;]" and provided Siebrecht with additional information.  Pl. App. 1A.

---

[33] ***Dovenmuehler v. St. Cloud Hosp.***, 509 F.3d 435, 439 (8th Cir. 2007).

[34] ***Fenney***, 327 F.3d at 713 n.8 (quoting **42 U.S.C. § 12102(2)** (1994)).

[35] ***Nyrop v. Independent School Dist. No. 11***, 616 F.3d 728, 734 (8th Cir. 2010).  Nor is an employer's knowledge of or accommodation of an impairment sufficient to establish a plaintiff is "regarded as having . . . an impairment."  ***Id***. at 736.

Siebrecht was seen at the Mayo Clinic for a second opinion in August 2014.[36] Brian Weinskenker, MD,[37] and other providers examined Siebrecht during a multi-day examination.[38] The results from various tests did not show indications of MS, and Dr. Weinskenker concluded there was not enough evidence to support a diagnosis of MS. Dr. Weinskenker testified that Siebrecht "had symptoms that [he] couldn't fully explain and could have potentially been compatible with MS, but [he] did not feel there was adequate objective evidence to reach that diagnosis." Pl. App. 119. Dr. Weinskenker was not able to say that Siebrecht did not have MS, but his "suspicion for MS . . . was rather on the low side." Pl. App. 119-20. The evidence from that time period is equivocal on whether Siebrecht actually had MS.

Dr. Weinskenker acknowledged that MS symptoms could worsen over time and that new areas of inflammation or spots could occur with or without symptoms. The evidence here does not necessarily support that this is what happened with Siebrecht. MRI results from January 2015 and November 2015 showed no significant changes from Siebrecht's prior MRI. Siebrecht visited Dr. Hartman in March 2016 (for headaches), and MRIs from that period showed "no evidence of Multiple Sclerosis activity." Def. Res. App. 154. A record from June 2016 reflects that an episode of generalized weakness had "[u]nclear etiology," but Dr. Hartman found that the rapid onset of symptoms, lack of certain specified symptoms, and a return to baseline made "[MS] relapse less likely." Def. Res. App. 159. An MRI in December 2017 showed results were stable from the prior MRI. In June 2019, Siebrecht reported severe pain and an inability to move, and Dr. Hartman concluded this was "less likely MS related." Def. Res. App. 168. During

---

[36] The medical records from this visit form the basis for Mercy's motion for sanctions (Doc. 37); Mercy argues Siebrecht improperly withheld these records.

[37] Dr. Weinskenker is a neurologist who specializes in MS and autoimmune neurology.

[38] The record contains specific information about the types of testing Siebrecht underwent and how this testing is used to show indications of MS.

an October 2021 visit (after Siebrecht's first period of FMLA leave from June to August of that year), Dr. Hartman concluded Siebrecht's symptoms were likely not related to MS. Siebrecht's MRI scans up to that point showed minimal changes from her 2014 results.[39] Dr. Hartman ordered a computed tomography (CT) scan and MRI "to exclude . . . MS relapse" as the cause of a recent fall and left-side impairments (she conveyed this to Dr. Hesse by letter[40]).

Dr. Hesse's records reference Siebrecht having MS, but Dr. Hesse relied entirely on Dr. Hartman's diagnosis. Dr. Hesse never tested Siebrecht for MS, he never diagnosed Siebrecht with MS, and he never treated Siebrecht for MS. Nor did he speak with anyone who had diagnosed Siebrecht's MS. Dr. Hesse was the only medical provider who imposed restrictions on Siebrecht's work (both her need to take leave and to work the restricted schedule). Yet, he could not say for certain whether Siebrecht actually suffered any MS flare during the time in question; he relied on Siebrecht's descriptions of her symptoms to complete the FMLA-paperwork and to impose work restrictions. Dr. Hesse could not say whether Siebrecht's MS was the cause of any of the issues she was experiencing.[41]

---

[39] During her 2014 visit to the Mayo Clinic, Siebrecht asked Dr. Weinskenker about future MRIs and he wrote that he "suppose[d]" they could do another scan in 18 months and that "if the MRI findings are stable at that time, I do not think further routine followup is necessary." Def. Res. App. 1.

[40] Dr. Hesse's records include a letter from Dr. Hartman dated October 25, 2021, in which Dr. Hartman indicated that she planned to have Siebrecht undergo additional testing. This testing never occurred. Dr. Hesse later noted during a visit with Siebrecht on February 25, 2022, that Siebrecht "should be seeing Dr. Hartman here fairly soon, at least by April or May, for followup of her multiple sclerosis" and that Dr. Hartman planned to have a new MRI "because it seems like [Siebrecht's] multiple sclerosis, which is relapsing and remitting, seems to be getting a bit worse." Siebrecht did not complete the CT scan or MRI ordered by Dr. Hartman; her last MRI was done on November 18, 2019 (it showed things were stable since the prior MRI in 2017). Siebrecht did not see Dr. Hartman after the October 2021 visit until Siebrecht reestablished care with Dr. Hartman on June 11, 2024.

[41] Dr. Hesse believed some of Siebrecht's reported issues (not being able to get out of bed for two months) stemmed from depression—not from MS. Pl. App. 103. In addition, Siebrecht

17

Determining whether Siebrecht suffered from MS during the relevant period and if so, whether it substantially limited a major life activity requires weighing the medical evidence and perhaps evaluating witness credibility—both tasks for a jury[42] and not the basis for granting summary judgment. The undisputed facts do not show Siebrecht was disabled under the ADA and ICRA.[43] Accordingly, her motion for partial summary judgment is denied.

### 2. Qualified Individual Element

Mercy asserts that Siebrecht cannot prove this element. To establish her discrimination claims, Siebrecht must prove she was a qualified individual.[44] This means

---

[42] indicated to Dr. Hesse that her symptoms might be the result of her other conditions—not just MS—and Dr. Hesse's impressions from that visit listed the other conditions (in addition to MS). Def. App. 260-61. At Siebrecht's followup visit with Dr. Hesse on February 25, 2022, he looked at issues related to her other impairments. Def. App. 292-94.

[42] "Whether an individual's impairment [limits them to the point of disability under the law] is a question of fact for the jury." *Crain Auto.*, 372 F. Supp. 3d at 755 (considering whether plaintiff could show diagnosed anxiety, depression, and panic attacks substantially limited plaintiff to qualify as disabled under the ADA).

[43] The cases Siebrecht relies upon are distinguishable—they did not involve a question whether the plaintiff actually suffered from a qualifying condition. *See Williams v. AT&T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 824-25 (W.D. Tenn. 2016) (deciding whether effects of plaintiff's conditions made her disabled, but noting there was no question that plaintiff suffered from the actual conditions); *Lenkiewicz v. Castro*, 146 F. Supp. 3d 46, 55 (D.D.C. 2015) ("defendant provides no facts or arguments to rebut plaintiffs['] evidence" of disability in case under the Rehabilitation Act). I do not address whether Siebrecht was disabled as a matter of law based on being regarded as having an impairment, since Siebrecht did not make that argument.

[44] As one district court has explained:

[I]n an ADA claim for job termination, the second element of a plaintiff's *prima facie* case—namely, whether he is qualified to perform the essential functions of the job (either with or without reasonable accommodation)—is, by the express terms of the statute, a statutory precondition to relief. Unlike claims of race, age, or gender discrimination, which require only that an individual suffer an adverse employment decision because of the improper criterion, the protections encompassed by the ADA are limited to "qualified individual[s] with a disability." Thus, in order to withstand summary

18

a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position."[45]  Determining whether a person is qualified to perform essential job functions "involves a two-fold inquiry: (1) whether the individual meets the necessary prerequisites for the job, such as education, experience, training, and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation."[46]  There is no dispute that Siebrecht has the professional qualifications to work as an APP in Mercy's ER.  The issue is whether she could perform the essential functions of that job, including whether a reasonable accommodation existed to enable her to do so.

Mercy argues that Siebrecht could not perform her job.  Accordingly, under the modified-burden-shifting approach, "[Mercy] has the burden of showing a particular job function is an essential function of the job."[47]  Relevant factors to this determination include (1) the employer's judgment as to which functions are essential; (2) written job descriptions of the position; and (3) the consequences of not requiring the worker to perform the function.[48]  The job functions at issue are working required shifts and also working weekend shifts.

The Eighth Circuit has recognized that regular attendance constitutes an essential function of employment, and a plaintiff who fails to demonstrate that she will have

---

[judgment], an ADA plaintiff must present sufficient evidence to raise a genuine issue of material fact concerning his status as "a qualified individual with a disability."

*Braziel v. Loran Maint. of Way, Inc.*, 943 F. Supp. 1083, 1097 (D. Minn. 1996) (citations omitted); *see also Mole v. Buckhorn Rubber Prods. Inc.*, 165 F.3d 1112, 1217 (8th Cir. 1999) (plaintiff bears the burden of proving this element).

[45] *Mole*, 165 F.3d at 1216 (quoting **42 U.S.C. § 12111(8)**).

[46] **Cravens v. Blue Cross & Blue Shield of Kan. City**, 214 F.3d 1011, 1016 (8th Cir. 2000); see also **Casey's Gen. Stores**, 661 N.W.2d at 520.

[47] *Rehrs*, 486 F.3d at 356.

[48] *Id.*; *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 707 (8th Cir. 2002).

consistent attendance (even with reasonable accommodation) fails to show that she is a "qualified individual" for a disability claim.[49] In some instances, working overtime in addition to regular hours can be an essential function of a job.[50] The parties do not appear to dispute that attendance is an essential function of Siebrecht's job, and the evidence supports that conclusion. Siebrecht's contract included the following provision: "Required Shifts. At the onset of this Agreement, Provider will be expected to work three (3) twenty four (24) hours shifts per pay period." Def. App. 130. During every four-week period, Siebrecht was required to work two shifts during weekends. Her contract stated: "Provider's schedule shall include event and weekend coverage, in addition to holiday coverage will [sic] be assigned per a fair and equitable schedule with other providers in the rotation." Def. App. 130. Mercy had a limited number of individuals who could perform the job—four APPs (with coverage by PRN and locums providers when necessary).[51] The Hawarden facility had only one ER provider scheduled at a time—not filling a shift resulted in the ER being unmanned by necessary staff. Siebrecht acknowledged it was "absolutely necessary" to have a provider in the ER at all times. Def. App. 68.

---

[49] *Lipp*, 911 F.3d at 544 ("This court has consistently stated that 'regular and reliable attendance is a necessary element of most jobs.'" (quoting *Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir. 1999))); *see also Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999) (noting, in case where plaintiff was limited to working four hours per day at time of her termination, that "it is axiomatic that in order for [plaintiff] to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work").

[50] *See Faidley*, 889 F.3d at 941 (where employer showed working overtime was essential to completing package deliveries, accommodation limiting employee to eight-hour work days made the plaintiff unqualified to perform essential functions of the job).

[51] *See Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 787 (8th Cir. 1998) (noting that "a job function may be considered essential . . . because a limited number of employees [are] available among whom the performance of that job function can be distributed" (quoting **29 C.F.R. § 1630.2(n)(2)**)).

20

Beginning in March 2022, Dr. Hesse limited Siebrecht to the restricted schedule: she could work only one 24-hour shift per week (a total of 48 hours every two weeks), and the shifts had to be performed Monday through Friday (no weekend shifts). The restricted schedule meant that Siebrecht could not meet the requirements of her contract—she was missing one-third of her required shifts, and she did not work any weekend shifts of the two required every four weeks. Siebrecht acknowledged that she was unable to work her required shifts and that this was contrary to her contract. Def. App. 104-05. Siebrecht argues that she was never cited for attendance issues. While true, this argument misses the point: Siebrecht was not able to work her required shifts. A plaintiff's absences, even if permitted by the employer or where the employer didn't warn the plaintiff that the absences were excessive, can equate to an inability to perform the plaintiff's job.[52]

In addition, Siebrecht's inability to work any weekend shifts made her unqualified. Requiring shift rotation (switching between day shifts and night shifts for example) can constitute an essential function of a job.[53] Siebrecht recognized that "not having help on the weekends would be ridiculous" because those "are typically the busiest" times in the ER. "[T]he term essential function encompasses more than core job requirements; indeed, it also may include scheduling flexibility."[54] Accordingly, both the ability to work all of her shifts (and not just two-thirds of them) and the ability to cover weekend shifts both constitute essential functions of Siebrecht's job. Under the restricted schedule, Siebrecht was not able to perform these essential functions and was thus unqualified.

---

[52] *See Lipp*, 911 F.3d at 545.

[53] *Rehrs*, 486 F.3d at 358-59.

[54] *Id.* (rejecting plaintiff's argument that the actual duties he performed during a shift and not him rotating between day shifts and night shifts was the essential function of his job, and holding that an employee being able to rotate between day shifts and night shifts was an essential function of the job).

The next step is to determine whether the restricted schedule was a reasonable accommodation (Mercy argues it was not). "[Siebrecht] is only required to make a facial showing that reasonable accommodation is possible," at which point Mercy has the burden of production to show it cannot accommodate.[55] An accommodation that equates to a part-time or reduced schedule is not a reasonable accommodation when the ability to work a specific schedule is an essential function of the job.[56] The court also looks at the hardship the accommodation may cause.[57] The restricted schedule made things harder for Siebrecht's coworkers. Pullman testified about Mercy's difficulty in filling the schedule and the frustration and weight felt by the other APPs in having to cover Siebrecht's shifts. On March 24, 2022, he sent an email to Brock about difficulty in staffing the ER, stating: "Right now we have 4 people, with one only pulling 1 shift a week. No wonder why I'm feeling short-staffed." Pl. Res. App. 328.

Siebrecht acknowledged that her coworkers had to cover her shifts when she was absent. Def. App. 91. She acknowledged that weekends were less-desirable shifts because they were generally busier, and that the scheduling of shifts needed to be fair. *Id*. at 80-81, 85. She apologized multiple times to her coworkers for putting them in a

---

[55] *Fjellestad*, 188 F.3d at 850.

[56] *See Faidley*, 889 F.3d at 941 (finding reduced shift of eight hours for UPS driver made him unqualified to perform the job, which required overtime work); *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2001) (suggesting that an inability to complete the duties of the job on a part-time schedule would make the accommodation of a part-time schedule unreasonable).

[57] Siebrecht argues that Mercy has waived this issue because it failed to plead undue burden as an affirmative defense (relying on cases from a completely different context). Doc. 72-1 at 17. The caselaw makes clear, however, that the burden on an employer is a relevant factor and is indeed addressed under the burden-shifting analysis of whether Siebrecht is a qualified individual. *See Lipp*, 911 F.3d at 543 (noting discrimination means failing to make an accommodation, "unless doing so 'would impose an undue hardship on the operation of the' employer's business" (quoting **42 U.S.C. § 12112(b)(5)**). Siebrecht in fact cites to this provision of the ADA. Doc. 72-1 at 18.

bind of having to work extra shifts due to her absences. *Id.* at 62. Siebrecht acknowledged that in February 2022, Mercy was having to offer providers bonuses to get shifts covered. *Id.* at 100A. Siebrecht also said (in answering why she thought Pullman might be biased against her) that "[she] was not able to fulfill [her] duties because of [her] MS." *Id.* at 67. Allowing Siebrecht to work the restricted scheduled "placed a heavier or unfavorable burden on other [APPs]."[58] The ADA does not require employers to provide "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities."[59] The restricted scheduled also imposed an additional burden on Mercy of having to hire other providers to cover Siebrecht's shifts. Siebrecht acknowledged that finding coverage to fill in for her was a hardship and that hiring PRNs and locums was expensive for Mercy. "An employer is not required to hire additional employees or redistribute essential functions to other employees."[60] The burden the restricted schedule caused Siebrecht's coworkers and Mercy shows it was not a reasonable accommodation.

---

[58] *Rehrs*, 486 F.3d at 357 (noting burden placed on other workers by allowing plaintiff to work only day shifts and not requiring rotation between day shifts and night shifts).

[59] *Id.*; *see also Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 813 (8th Cir. 2015) (finding accommodation that required other employees to perform tasks of plaintiff's job and necessitated coworkers to work additional hours was not reasonable); *Alexander v. Northland Inn*, 321 F.3d 723, 727-28 (8th Cir. 2003) (accommodation that required assigning job responsibilities to coworkers for an indefinite period not reasonable); *see also Moritz*, 147 F.3d at 788 ("[employer] is not obligated to hire additional employees or reassign existing workers to assist" plaintiff with her job duties").

[60] *Mole*, 165 F.3d at 1218; s*ee also Hatchett*, 251 F.3d at 675 (noting that although a part-time schedule could be a reasonable accommodation, "an employer is not required to reallocate essential functions that an individual must perform" and "is not required to hire additional employees or assign those tasks that the employee could not perform to other employees"); *Fjellestad*, 188 F.3d at 950 (noting prior holdings that "an employer need not reallocate . . . the essential functions of a job to accommodate" in determining employer was "not obligated to hire additional employees or reassign existing workers to assist [plaintiff] in her essential duties").

Siebrecht relies on the fact that Mercy was able to cover her shifts with the other APPs, PRNs, and locums. Courts, however, have rejected this argument.[61] Similarly, it does not matter that Siebrecht could resume her full work schedule in the future. "[W]hether a plaintiff is qualified is measured at the time of the adverse employment action, even if the plaintiff is likely to recover in a relatively short period of time."[62] It was unclear when Siebrecht would return to her full schedule and the extent to which future flares would necessitate the restricted schedule.[63] Siebrecht points to a letter from Dr. Hesse that released her to return to work without restriction in June 2022—after her termination notice and the effective date of her termination. Mercy was entitled to rely on the information available at the time;[64] it was not "required to predict" when Siebrecht

---

[61] *See **Lipp***, 911 F.3d at 546 (noting that employer is not deemed to have conceded reasonableness of an accommodation where employer "bends over backwards to accommodate a disabled worker" by allowing a "far-reaching" accommodation and that to hold otherwise would punish employer—ADA does not apply in that manner); ***Rehrs***, 486 F.3d at 358 (rejecting argument that employer temporarily allowing plaintiff to work only day shifts (with no rotation to night shifts) showed shift rotation was not an essential function of the job).

> "An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous." "To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers."

***Id.***

[62] ***Duello***, 628 F.3d at 972; *see also **Browning***, 178 F.3d at 1048-49 (affirming termination of plaintiff restricted to working only four hours per day after surgery as not able to carry out essential functions of her job at the time (while recovering from surgery and prior to being fully recovered); "she was not a qualified individual at the time of her termination, and thus not under the protective umbrella of the ADA"); ***Ciszewski v. Engineered Polymers Corp.***, 179 F. Supp. 2d 1072, 1089 (D. Minn. 2001) ("Where a plaintiff is discharged from temporary light-duty assignments the focus is not on the essential functions of this temporary position, but on plaintiff's permanent position.").

[63] *See, e.g., **Brannon v. Luco Mop Co.***, 521 F.3d 843, 849 (8th Cir. 2008) (finding employer was not required to allow unlimited leave under the ADA in failure to accommodate claim).

[64] *See **Alexander***, 321 F.3d at 727 (8th Cir. 2003).

would be able to resume working all of her required shifts.[65]  The restricted schedule—by which Siebrecht would miss one-third of her shifts and all weekend shifts—was not a reasonable accommodation.

Finally, Siebrecht argues that Mercy failed to accommodate by not engaging in the interactive process to find a reasonable accommodation.[66]

> Although there is no per se liability under the ADA if an employer fails to engage in an interactive process, [the Eighth Circuit has] previously noted that, for the purposes of summary judgment, "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith. Under these circumstances, . . . a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA."[67]

"To establish that an employer failed to participate in an interactive process, a disabled employee must show: (1) the employer knew about the employee's disability; (2) the employee requested accommodation or assistance for his or her disability; (3) the

---

[65] *Hatchett*, 251 F.3d at 675-676 (noting "[e]mployers are not required to predict the employee's degree of success with recovery."); *see also Lipp*, 911 F.3d at 546.

[66] I reject Mercy's argument that Siebrecht's failure to accommodate claim fails because she acknowledges that Mercy accommodated her as requested (Def. App. 103).  When a plaintiff fails to request or adequately inform her employer of the need for an additional accommodation, her claim of failure to accommodate fails.  *See Lenzen v. Workers Comp. Reins. Ass'n*, 705 F.3d 816, 822 (8th Cir. 2013) (plaintiff's claim failed because she never requested different accommodations than those made by the employer, nor did she show the allegedly inadequate accommodation impacted her health or work).  While it is true that Siebrecht did not request additional accommodation beyond the restricted schedule, she argues she was not aware she needed to do so because she did not know that Mercy found the restricted schedule to be untenable.  I believe the better course in this case is to address Siebrecht's claim of failure to accommodate.

[67] *Cravens*, 214 F.3d at 1021 (quoting *Fjellestad*, 188 F.3d at 952); *see also Ehlers v. Univ. of Minn.*, 34 F.4th 655, 660 (8th Cir. 2022) (relying on *Fjellestad* in holding that "a plaintiff can survive summary judgment on a reasonable-accommodation claim by showing that the employer failed to engage in an interactive process, even though failing to do so does not itself give rise to liability under the ADA"); *Ciszewski*, 179 F. Supp. 2d at 1091.

25

employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith."[68] Here, Siebrecht's argument fails because she cannot show that the restricted scheduled constituted a reasonable accommodation. When a plaintiff fails to meet her burden to show that a reasonable accommodation existed that would not place an undue burden on the employer, the "employer is not liable for failing to engage in a good-faith interactive process" and is entitled to summary judgment on the plaintiff's ADA discrimination claim.[69]

Siebrecht likewise fails to provide sufficient evidence that Mercy could have reasonably accommodated her by reassigning her to a different position and that the position would allow for her restricted schedule. Siebrecht makes a general argument she could have been reassigned. In his email on March 28, 2022, Pullman mentioned to Pingel (in saying the 24-hour shift restriction through December would not work) that perhaps Siebrecht could work her 24-hour shift at MercyOne (a different facility). The record does not show that Mercy took any action to try and identify other positions Siebrecht could have been reassigned to. This *may* create a genuine issue of material fact about whether Mercy made good-faith efforts to reasonably accommodate Siebrecht.[70]

---

[68] *Ehlers*, 34 F.4th at 661 (quoting *Cravens*, 214 F.3d at 1021).

[69] *Scrugg v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1094 (8th Cir. 2016) (quoting *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864 (8th Cir. 2006)); *Dropinski*, 298 F.3d at 710 (holding that where requested accommodation would impose undue burden on employer, discussion of whether employer properly engaged in interactive process was "superfluous"); *Ciszewski*, 179 F. Supp. 2d at 1091.

[70] *See Ehlers*, 34 F.4th at 661-62 (noting genuine issue of material fact may exist where employer "discontinued discussing accommodations" and took no steps to determine the employee's abilities or whether other available positions existed); *but see Casey's Gen. Stores*, 661 N.W.2d at 521 (stating an employer "has some obligation, *based on the employee's initiation of the process*, to reassign a disabled employee . . . as a reasonable accommodation" (emphasis added)).

Even so, Siebrecht cannot succeed on this issue. "To show that reassignment is a possible accommodation, the plaintiff must make a facial showing that a position is available for which [plaintiff] qualifies."[71] Here, Siebrecht failed to identify any alternate position that was open, let alone the requirements of that position, and that she could perform its essential functions. "[E]ven if [Mercy] did not use good-faith efforts," Siebrecht's claim fails "based on the lack of evidence about the duties and requirements of [another position] and whether she could perform them" with her restricted scheduled.[72]

The evidence shows Siebrecht was not qualified as a matter of law.

### 3. *Discrimination Element*

Because Siebrecht cannot show she was a qualified individual, the court need not reach the discrimination element.[73] Regardless, it seems Siebrecht's claim fails. Pullman's email to Pingel (that the restricted schedule was not working out and that they needed to terminate Siebrecht) could constitute direct evidence of discrimination:

---

[71] *Ehlers*, 34 F.4th at 660-62 (citations omitted) (affirming grant of summary judgment to employer where plaintiff failed to produce "the job posting, the job title, or any evidence of the duties or requirements of any position" that plaintiff argues would have reasonably accommodated her disability); *see, e.g., Fjellestad*, 188 F.3d at 950-51 (finding plaintiff made facial showing and created genuine issue of material fact of whether employer could have reassigned her to a specific position (shift manager) that came open after the employer promoted another employee from that position to the job plaintiff no longer qualified for (unit manager)); *see also Casey's Gen. Stores*, 661 N.W.2d at 524-25 (holding plaintiff must identify a specific position that was available that plaintiff actually sought or desired).

[72] *Ehlers*, 34 F.4th at 662.

[73] *See Browning*, 178 F.3d at 1047 (declining to address disability and discrimination elements because plaintiff "failed to establish that she was a qualified individual under the ADA at the time of her termination" in wrongful termination case); *see also Duello*, 628 F.3d at 974 (holding defendant entitled to summary judgment when plaintiff was unable to perform essential functions of his job (restricted from driving for six months as result of a seizure) without addressing disability issue); *Hill v. Walker*, 737 F.3d 1209, 1217-18 (8th Cir. 2013) (affirming grant of summary judgment where plaintiff could not perform essential functions of job with or without reasonable accommodation and not addressing other factors).

Pullman and Pingel participated in the decision to terminate Siebrecht's employment, the statement was made within a month of that decision being made, and it tends to show that she was fired due to her inability to work.[74] These statements, however, do not "betray discriminatory animus toward the disabled," rather, they "could reasonably be made about" any provider who was unable to work one-third of her shifts or any weekend shifts for reasons unrelated to a medical issue or disability (such as the need to care for a family member).[75] "It is not necessarily unlawful for an employer to terminate an employee for reasons related to her disability; it may be perfectly lawful to terminate an employee who (because of her disability) cannot perform the essential functions of her position even with every reasonable accommodation."[76]

Ultimately, however, I do not reach this element. Because Siebrecht cannot establish the qualified individual element, Mercy is entitled to summary judgment on

---

[74] *See Crain Auto.*, 372 F. Supp. 3d at 757 (finding comments that "due to [plaintiff's] health, it wasn't going to work out and [plaintiff] should take time for herself" constituted direct evidence of discrimination, noting statements were made by plaintiff's supervisor, during meeting in which plaintiff was fired, and related directly to the decision to fire plaintiff with no indication the statements were made in an attempt to help plaintiff maintain her job (cleaned up)); *but see EEOC v. Clarksville Health Sys., G.P.*, 617 F. Supp. 3d 844, 857 (M.D. Tenn. 2022) (finding that even if the plaintiff's "disability-based restrictions were likely a factor in her ultimate termination" an inference would have to be drawn "to determine that the termination was due to unlawful discrimination rather than, for example, a concern that she could not perform the essential functions of the job even with every reasonable accommodation"). In *Clarksville Health*, the court concluded the statement that an ER nurse employee "wouldn't be able to continue her job as she was doing" (with restrictions that had just become permanent) and that "her employment would be terminated if they could not find her another (suitable) position within ten days" were not direct evidence of discrimination. 617 F. Supp. 3d at 856-67. "A statement that merely expresses concern about the plaintiff's ability to perform job requirements is *not* direct evidence of disability discrimination." *Id.*

[75] *Menge v. Simon's Trucking, Inc.*, No. C20-1016-LTS, 2021 WL 3921346, at *9 (N.D. Iowa Sept. 1, 2021) (noting that the comments made about the plaintiff could have been made about any unproductive employee, disabled or not); *Clarksville Health Sys.*, 617 F. Supp. 3d at 857.

[76] *Clarksville Health Sys.*, 617 F. Supp. 3d at 857.

28

Siebrecht's ADA and ICRA disability claims.[77]

### B. FMLA Claim

Siebrecht argues that Mercy violated the FMLA by terminating her employment. Under the FMLA, an employee may take up to twelve weeks of unpaid leave during any twelve-month period due to a serious health condition.[78] An employer cannot discriminate against the employee (including by terminating employment) for taking FMLA leave.[79] For Siebrecht to establish her FMLA discrimination claim, she must establish that (1) she engaged in a protected activity (taking FMLA leave), (2) she suffered an adverse employment action (termination), and (3) a causal connection between the protected activity and the adverse employment action.[80] The third element requires a showing that Mercy's termination of Siebrecht's employment was motived by Siebrecht taking FMLA.[81]

The undisputed facts in this case show that Siebrecht was allowed to take all requested FMLA leave. In fact, she was allowed more than twelve weeks (at least 13 ½

---

[77] *Faidley*, 889 F.3d at 941 (concluding that employer did not violate ADA or ICRA by failing to allow reduced schedule that made employee unqualified (8-hour schedule for job that required overtime)); *Brannon*, 521 F.3d at 848 (affirming grant of summary judgment on failure to accommodate claim where plaintiff failed to make prima facie showing that she was qualified individual because proposed accommodation not reasonable).

[78] *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012); *Browning*, 178 F.3d at 1049.

[79] *Pulczinski*, 691 F.3d at 1005-06 (noting 29 U.S.C. § 2615(a) makes it unlawful "to discharge or in any other manner discriminate against" someone for taking FMLA leave, and that these "discrimination" claims are a third type of claims under FMLA, in addition to "interference" claims and "retaliation" claims).

[80] *See Pulczinski*, 691 F.3d 996, 1007 (noting courts use the *McDonnell Douglas* burden-shifting to analyze these claims).

[81] *Pulczinski*, 691 F.3d at 1006-07.

Case 5:23-cv-04014-KEM   Document 112   Filed 09/30/24   Page 29 of 31

weeks) during a roughly nine-month period—she took around eight weeks from June 3 to August 1, 2021, and around six weeks from January 31 to March 14, 2022. Siebrecht returned to work after both periods of leave (Mercy in fact offered to renew her contract after she returned from the first period of leave). Mercy had legitimate, non-discriminatory reasons for terminating Siebrecht: her inability to perform her job with the restricted schedule.[82]

There is no evidence to support a finding that Mercy terminated Siebrecht because she took FMLA leave. Accordingly, Mercy is entitled to summary judgment on Siebrecht's FMLA discrimination claim.

### III.  CONCLUSION

The court **DENIES AS MOOT** Siebrecht's motions to supplement the record (Docs. 79, 94) with the additional information from Dr. Hartman.

The court **DENIES** Siebrecht's motion for partial summary judgment (Doc. 43) because a material factual dispute exists as to whether Siebrecht was disabled.

The court **GRANTS** Mercy's motion for summary judgment (Doc. 50) on all claims: Siebrecht cannot establish as a matter of law that she was a qualified individual as required for her ADA and ICRA discrimination claims; nor can Siebrecht provide a causal connection between her termination and taking FMLA leave on her FMLA discrimination claim.

The court **DENIES AS MOOT** Mercy's motion for sanctions seeking dismissal (Doc. 37) and motion to supplement (Doc. 95).

---

[82] *See **Battle***, 438 F.3d at 864-65 (affirming grant of summary judgment because plaintiff could not perform essential functions of his job at the time he sought to return to work). "Unlike the ADA, the FMLA does not mandate that employers reinstate employees who are unable to perform the essential functions of their positions. Similarly, the FMLA omits any requirement that employers seek to reasonably accommodate employees who cannot perform the essential functions of their respective positions. Any duty to accommodate the employee is governed solely by the ADA." ***Id***. (citations omitted)

The court **DENIES AS MOOT** Mercy's motion in limine (Doc. 103).

The court **DENIES AS MOOT** Siebrecht's motion in limine (Doc. 104).

The Clerk of Court will enter Judgment for Defendant Mercy Health Service.

**SO ORDERED** on September 30, 2024.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa